## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NIALL LEDWIDGE, MICHAEL PEARSON AND ANDREW CHILDE, AS JOINT OFFICIAL LIQUIDATORS OF SILICON VALLEY BANK (CAYMAN ISLANDS BRANCH) (in Official Liquidation), 2nd Floor Harbour Centre, 159 Mary Street, Georgetown, Grand Cayman, Cayman Islands; SILICON VALLEY BANK (CAYMAN ISLANDS BRANCH) (In Official Liquidation), 2nd Floor Harbour Centre, 159 Mary Street, Georgetown, Grand Cayman, Cayman Islands, | Case No.: |
| Plaintiffs, | |
| vs. | |
| FEDERAL DEPOSIT INSURANCE CORPORATION (as receiver of Silicon Valley Bridge Bank, N.A.); FEDERAL DEPOSIT INSURANCE CORPORATION (as receiver of Silicon Valley Bank, Santa Clara); GEORGE R. FRITZ, in his individual capacity; JANINE D. HENKES, in her individual capacity; JOHN DOES 1-100, | |
| Defendants. | |

## **COMPLAINT**

NOW COME plaintiffs Silicon Valley Bank (Cayman Islands Branch) (in official liquidation) ("**SVB Cayman**"), and Andrew Childe, Niall Ledwidge and Michael Pearson, in their capacities as the duly appointed joint official liquidators of SVB Cayman (the "**JOLs**" and collectively with SVB Cayman, the "**Plaintiffs**") and bring this Complaint against defendants Federal Deposit Insurance Corporation, in its capacity as receiver of Silicon Valley Bank, Santa Clara ("**FDIC-R1**"), Federal Deposit Insurance Corporation, in its capacity as receiver of Silicon Valley Bridge Bank, N.A. ("**FDIC-R2**" and collectively with FDIC-R1, "**FDIC-R**"), George R.

Fritz, in his individual capacity, ("**Fritz**") Janine D. Henkes, in her individual capacity ("**Henkes**") and John Does 1-100 (collectively with FDIC-R, Fritz and Henkes, the "**Defendants**").

## NATURE OF ACTION

1.      This action is brought in connection with the arbitrary decision of the Federal Deposit Insurance Corporation and its employees to grant "insured deposit" classification to certain account holders of the Cayman Islands branch of Silicon Valley Bank, but deny similar classification to the remaining SVB Cayman account holders, and the unauthorized transfer of funds and credits associated with these accounts. This disparate treatment was purportedly predicated on the basis of the alleged geographic location of the deposit "credits" being "in" the United States at the time of the SVB collapse, despite identical language in *every* SVB Cayman account agreement stating that SVB Cayman accounts are not FDIC-insured and are only payable and collectible in the Cayman Islands.

2.      The practical reality and reasons for this arbitrary decision are apparent: upon information and belief, the account holders classified as general unsecured creditors – which are thus not entitled to FDIC insurance and are out of the money in the receivership waterfall – are *overwhelmingly* of Chinese origin or associated with Chinese interests, while the holders of Cayman accounts classified as insured deposits are geographically neutral.

3.      The ostensible basis given by FDIC-R for this disparate treatment – that the "credits" of the insured accounts were geographically located "in" the United States whereas the others were not – is specious at best. All of the three account products' credits were geographically located in the United States at all times material.

4.      Upon information and belief, also located in the United States were the credits associated with the SVB Cayman Domestic Account (defined below), an account maintained at

2

SVB's main headquarters for the sole benefit of the SVB Cayman branch.  At no point has FDIC-R notified SVB Cayman or its duly-appointed joint official liquidators of the status or existence of the SVB Cayman Domestic Account.

5.      The JOLs are the Court-appointed representatives of SVB Cayman, an estate and statutory trust created by operation of Cayman law to wind up the affairs of SVB's assets and affairs in the Cayman Islands – namely, the SVB Cayman branch.  Pursuant to the Cayman Winding Up Order (defined below) appointing the JOLs, the JOLs have standing to bring claims directly on behalf of SVB Cayman and to bring claims as the exclusive agent of all depositors-creditors of SVB Cayman.

6.      This Complaint brings these claims on behalf of those parties.  The Plaintiffs assert claims seeking this Court's *de novo* review, pursuant to 12 U.S.C. § 1821(d)(6), of FDIC-R's disallowance of claims submitted by the JOLs and, on a provisional basis, claims submitted by SVB Cayman's depositors-creditors.  As set forth below, the decision by FDIC-R to misclassify the holders of Eurodollar Operating Account and the Eurodollar Money Market Account as general unsecured creditors is completely arbitrary, and factually wrong: the funds and credits associated with all SVB Cayman deposit accounts and the SVB Cayan Domestic Account were always located in the United States.

7.      The Plaintiffs further assert claims outside of the claims resolution process of 12 U.S.C. § 1821(d)(6) in connection with the *ultra vires* acts of FDIC-R in connection with the taking and transfer of all funds and credits associated with the SVB Cayman Domestic Account and SVB Eurodollar Accounts in violation of applicable law.  FDIC-R stands in the shoes of SVB, which consented to Cayman jurisdiction and Cayman law, which prohibited FDIC-R's transfer and taking of possession of all funds and credits associated with SVB Cayman without express authority of

Cayman regulators and the Grand Court of the Cayman Islands.  The actions of Defendants here are no different to a bill of attainder – a deprivation of due process and property rights by the members of a single government branch without express authority to accomplish the same.

8.      Finally, the Plaintiffs assert claims against Henkes and Fritz – the Receivers-in-Charge appointed by the FDIC to administer the receiverships of SVB and Bridge Bank – in their individual capacity due to their actions which resulted in SVB Cayman and SVB Cayman's depositors-creditors being deprived of property without due process under the Fifth Amendment of the United States Constitution.   *See Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971).

## JURISDICTION AND VENUE

9.      This action arises under the Fifth Amendment of the United States Constitution, the Federal Deposit Insurance Act, 12 U.S.C. § 1811, *et seq*., as amended, and the Administrative Procedure Act, 5 U.S.C. § 500, *et seq*.  This Court has jurisdiction over the subject matter of this action pursuant to 12 U.S.C. §§ 1819(b)(2)(A) and 1821(d)(6), and 28 U.S.C. § 1331.  Pursuant to 28 U.S.C. § 1367, the Court has supplemental jurisdiction over any claim deemed not to contain a federal question, because it is part of the same case or controversy.

10.     Venue is proper under 12 U.S.C. § 1821(d)(6)((A), which provides that, in connection with a claim disallowed by the FDIC in its capacity as receiver, a claimant may file suit to seek *de novo* review of the disallowance in "the United States District Court for the District of Columbia (and such court shall have jurisdiction to hear such claim)." Venue is also proper under 28 U.S.C. § 1391(b), as a substantial portion of the actions and decisions of Defendants took place within the District.

## NOTICE OF INTENT TO RAISE ISSUES OF FOREIGN LAW

11.     Pursuant to Federal Rule of Civil Procedure 44.1, Plaintiffs hereby gives notice of their intent to raise issues of foreign law. Specifically, Plaintiffs contend that the substantive law of the Cayman Islands, as cited herein, governs some or all of the parties' disputes.

## RELEVANT PARTIES

12.     Silicon Valley Bank, Santa Clara ("**SVB**") was an FDIC-insured, state-chartered bank headquartered at all relevant times in Santa Clara, California and established to provide banking services to Silicon Valley's growing number of technology companies.

13.     On August 16, 2007, SVB registered in the Cayman Islands as a foreign company under Part IX of the Cayman Islands Companies Act ("**Companies Act**").

14.     On August 30, 2007, SVB applied for and was granted a Class "B" banking license from the Cayman Islands Monetary Authority ("**CIMA**") under the Cayman Islands Banks and Trust Companies Act (2021 Revision) (the "**BTC Act**").

15.     Pursuant to the BTC Act, SVB Cayman as the holder of a "B" class banking license may not, amongst other things, take deposits from any person resident in the Cayman Islands, other than another licensee or an exempted or ordinary non-resident company which is not carrying on business in the Cayman Islands.

16.     Following its registration in the Cayman Islands and the granting of a Class "B" license from CIMA, SVB had an active branch in the Cayman Islands, the established SVB Cayman branch.  The primary purpose of SVB Cayman was for deposit products.

5

17.     Silicon Valley Bridge Bank, N.A. ("**Bridge Bank**") is a full-service bridge bank created and managed by the FDIC following the March 13, 2023 transfer of all deposits, both insured and uninsured, and substantially all assets of SVB to the Bridge Bank.

18.     Plaintiff SVB Cayman is the subject of an insolvency proceeding under the Companies Act pursuant to, *inter alia*, the Winding Up Order of the Grand Court of the Cayman Islands, Financial Services Division ("**Grand Court**"), Cause No. FSD 163 of 2023 (DDJ) (the "**Cayman Proceeding**") entered on June 30, 2023.

19.     On June 13, 2023, certain SVB Cayman depositors-creditors which had been classified as uninsured, general creditors of the SVB Receivership, submitted a Winding Up Petition to the Grand Court seeking, *inter alia*, the winding up of SVB Cayman under the Companies Act, and the appointment of joint official liquidators for SVB Cayman (the "**Winding Up Petition**").  A true and correct copy of the Winding Up Petition is attached hereto as **Exhibit 1**.

20.     On June 30, 2023, the Grand Court of the Cayman Islands issued the Winding Up Order, which authorizes Plaintiffs Michael Pearson, Andrew Childe, and Niall Ledwidge to act jointly and severally as joint official liquidators of SVB Cayman (the "**Winding Up Order**").  A true and correct copy of the Winding Up Order is attached hereto as **Exhibit 2**.

21.     On July 21, 2023, the Grand Court entered a Judgment explaining the justifications for the Winding Up Order (the "**July 2023 Opinion**").  A true and correct copy of the July 2023 Opinion is attached hereto as **Exhibit 3**.

22.     In the July 2023 Opinion, the Grand Court found that jurisdiction existed under section 91(d)(iv) of the Companies Act for the Grand Court to order SVB Cayman's winding up, *notwithstanding* the United States-based receivership of SVB, and confirmed that doing so is just

and equitable given the public interest in investigating and understanding its depositors-creditors'
position relative to SVB, and to protect their interests.

23.     The Federal Deposit Insurance Corporation, in its corporate capacity ("**FDIC-C**")
is an agency of the United States government charged by law with, among other duties,
administering the Federal Deposit Insurance Act and the federal bank deposit insurance system.
The Federal Deposit Insurance Corporation, pursuant to its statutory authority, has been acting as
receiver for SVB and its successor Bridge Bank since March 2023 (the "**SVB Receivership**").
The Plaintiffs bring the instant action against the FDIC in its capacity as receiver of SVB and the
Bridge Bank.

24.     Defendant Janine D. Henkes is an employee of the FDIC that was appointed as
Receiver-in-Charge of SVB in connection with FDIC-R1's administration of the receivership of
SVB.

25.     Defendant George R. Fritz is an employee of the FDIC that was appointed as
Receiver-in-Charge of the Bridge Bank in connection with FDIC-R2's administration of the
receivership of the Bridge Bank.

26.     John Does 1-100 are other federal officials to be learned through discovery which
also contributed to decisions which deprived SVB Cayman and SVB Cayman's depositors-
creditors of property without due process, in violation of the Fifth Amendment to the United States
Constitution.

## **FACTUAL BACKGROUND**

I.     **SVB Cayman**

    A.  **Cayman Regulation of SVB Cayman**

27.     SVB Cayman was at all times overseen, regulated, and licensed by CIMA, which serves as the Cayman Islands' primary financial services regulator, and was otherwise subject to the Cayman Islands Banking laws.

28.     CIMA was established pursuant to the Monetary Authority Law (2016 revision) ("**CIMA Act**"). The CIMA Act provides at section 6(1)(b)(i) that CIMA's principal function includes actions "to regulate and supervise financial services business carried on in or from within the Islands in accordance with this law and the regulatory laws." A true and correct copy of relevant excerpts from the CIMA Act are attached hereto as **Exhibit 4**.

29.     The BTC Act provides express statutory authority for CIMA to seek the liquidation of a foreign branch which falls under the regulatory authority of CIMA. A true and correct copy of relevant excerpts from the BTC Act are attached hereto as **Exhibit 5**.

30.     Pursuant to Section 18 of the BTC Act, where CIMA is of the opinion, amongst other things, that an entity regulated and licensed by CIMA "is or appears likely to become unable to meet its obligations as they fall due" or "is carrying on business in a manner detrimental to the public interest [and] the interests of its depositors…", CIMA may:

   a.   appoint a person to advise the licensed branch on the proper conduct of its affairs and to prepare a report to CIMA thereon (an "Advisor"). *See* BTC Act, § 18(1)(iv);

   b.   seek authority from the Grand Court to appoint a person to assume control of the licensed branch's affairs (a "Controller") with powers akin to a receiver. *See* BTC Act, § 18(1)(v); and

   c.   on receipt of any report prepared by an Advisor or Controller, revoke a branch's license and make an application to the Grand Court for the winding up and liquidation of the foreign branch. *See* BTC Act, § 18(4)(d).

31.     The BTC Act also sets forth a detailed procedure for a licensee which wishes to terminate banking activity in the Cayman Islands. Section 20 of the BTC Act provides in full:

#242597214_v1

(1) A licensee which has ceased to carry on the business in respect of which the [license] was granted may apply to the Authority to surrender its [license] if it —

    (a) has ceased to carry on such business, and produces evidence that it has repaid all deposits held by it and has transferred all trust assets held or administered by it: or

    (b) is being wound up voluntarily and produces evidence that it is solvent and able forthwith to repay all deposits held by it and all its other creditors and has transferred all trust assets held or administered by it, and the Authority may thereupon approve the surrender.

(2) In the case of an application under paragraph (b) of subsection (1) the Authority may apply to the Court for the licensee to be wound up either by that Court or subject to its supervision, and on the making of such an order the provisions of the Companies Act (2021 Revision) relating to the winding up of a company by or subject to the supervision of that Court shall, *mutatis mutandis*, apply.

32.     CIMA publishes the Cayman Islands Monetary Authority Enforcement Manual (the "**Enforcement Manual**") in order to set out the policies and procedures to be followed by CIMA, its committees and its officers in performing CIMA's regulatory functions under Cayman law. A true and correct copy of relevant excerpts from the Enforcement Manual are attached hereto as **Exhibit 6**.

33.     The Enforcement Manual is applicable and binding on all parties subject to CIMA's regulatory functions, which includes SVB Cayman and the SVB Receivership's predecessor-in-interest, SVB.

34.     The Enforcement Manual provides CIMA with broad powers to regulate the holders of banking licenses in the Cayman Islands, including: (i) suspension of a banking license; (ii) imposition or amendment of conditions on a banking license; (iii) requiring the substitution of a director, operator, senior officer, general partner, promoter, insurance manager or shareholder of a licensee; and (iv) appointment of a person to assume control of the affairs of a licensee, or advise the license on the proper conduct of its affairs.

35.     Moreover, CIMA or the creditors of a licensed bank or foreign registered company are empowered to apply to the Grand Court of the Cayman Islands for an order directing that the company be wound up in accordance with the Companies Act or a limited liability company be wound up in accordance with the Limited Liability Companies Act.  A true and correct copy of relevant excerpts from the Companies Act is attached hereto as **Exhibit 7**.

36.     Creditors of a company registered as a foreign company in the Cayman Islands are permitted to seek the winding up of the foreign company in the Grand Court if the foreign company (i) has property located in the Cayman Islands; (ii) is carrying on business in the Cayman Islands; (iii) is the general partner of a limited partnership; or (iv) is registered under Part IX.

37.     In this case, the creditors of SVB Cayman made such an application through the Winding Up Petition and obtained the Winding Up Order, before any similar application by CIMA was accomplished.

**B.   The Cayman-Regulated Deposit Products Offered by SVB Cayman**

38.     SVB Cayman offered three types of accounts to customers: 1) Eurodollar Sweep Account; 2) Eurodollar Operating Account; and 3) Eurodollar Money Market Account (collectively, the "**SVB Cayman Eurodollar Accounts**"). When SVB failed in March 2023, SVB Cayman's customers had, in the aggregate, approximately $866 million deposited in three types of accounts.

**i.     Eurodollar Sweep Account**

39.     The Eurodollar Sweep Account was a business account maintained at SVB Cayman. In the account agreement, SVB stated that the SVB Eurodollar Sweep Account was "held at Silicon Valley Bank's Cayman Islands Branch."  A true and correct copy of a template account

agreement for a Eurodollar Sweep Account ("**Sweep Agreement**") is attached hereto as **Exhibit 8**.

40.     The Sweep Agreement states: "The SVB Eurodollar Sweep Account provides clients with a convenient way to earn interest while keeping their funds available for banking needs. Client balances automatically transfer or 'sweep' between the Deposit Account [located in the United States] and the interest-bearing SVB Eurodollar Sweep Account held at Silicon Valley Bank's Cayman Islands Branch." Ex. 8 at p. 1.

41.     The Sweep Agreement contains provisions notifying SVB Cayman customers-depositors of the applicability of Cayman law, that their accounts are only payable and collectible at SVB Cayman and subject to the exclusive jurisdiction of the Cayman Courts, and their duty to comply with Cayman law:

> [T]he SVB Eurodollar Sweep Account shall be and shall remain subject to the laws of the Cayman Islands and to the paragraph below. You agree not to conduct any transaction that would violate any laws of any state or the United States (including the economic sanctions administered by the U.S. Treasury's Office of Foreign Assets Control), of the Cayman Islands or of any other government.
>
> SVB Eurodollar Sweep Account deposits are deposits of the Cayman Islands branch of Silicon Valley Bank ('Cayman Branch') and are subject to the laws of the Cayman Islands. These deposits are NOT domestic deposits, are NOT insured by the FDIC and are NOT guaranteed in any way by the United States government or any government agency thereof. The obligations related to the SVB Eurodollar Sweep Account will be payable and collectible only at and by the Cayman Branch, subject to the laws (including any governmental actions, orders, decrees and/or regulations) and under the exclusive jurisdiction of the courts of the Cayman Islands.

Ex. 8 at p. 3.

42.     At the time of the SVB Collapse (defined below), there were forty four (44) active Eurodollar Sweep Accounts, with total account balances of $389,562,086.

### ii.     **Eurodollar Money Market Account**

43.     A Eurodollar Money Market Account was a traditional, interest-bearing business money market account available to SVB Cayman customers. In the account agreement, SVB affirmatively stated that the Eurodollar Money Market Account was established "at Silicon Valley Bank's Cayman  Islands branch office."  A true and correct copy of a template account agreement for a Eurodollar Money Market Account ("**Money Market Account Agreement**") is attached hereto as __Exhibit 9__

44.     The Money Market Account Agreement contains provisions notifying SVB Cayman customers-depositors of the applicability of Cayman law, that their accounts are only payable and collectible at SVB Cayman and subject to the exclusive jurisdiction of the Cayman Courts, and their duty to comply with Cayman law:

> [T]he Eurodollar Money Market Account(s) shall be and shall remain subject to the laws of the Cayman Islands and to the paragraph below. You agree not to conduct any transaction that would violate any laws of any state or the United States (including the economic sanctions administered by the U.S. Treasury's Office of Foreign Assets Control), of the Cayman Islands or of any other government.
>
> SVB Eurodollar Money Market Account deposits are deposits of the Cayman Islands branch of Silicon Valley Bank ('Cayman Branch') and are subject to the laws of the Cayman Islands. These deposits are NOT domestic deposits, are NOT insured by the FDIC and are NOT guaranteed in any way by the United States government or any government agency thereof. The obligations related to the SVB Eurodollar Money Market Account will be payable and collectible only at and by the Cayman Branch, subject to the laws (including any governmental actions, orders, decrees and/or regulations) and under the exclusive jurisdiction of the courts of the Cayman Islands.

Ex. 9 at pp. 2-3.

45.     At the time of the SVB Collapse, there were one-hundred six (106) active Eurodollar Money Market Accounts, with total account balances of $108,400,111.

**iii.     Eurodollar Operating Agreement**

#242597214_v1

46.     The Eurodollar Operating Account was a traditional business operating account that was not interest bearing. In the account agreement, SVB affirmatively stated that the SVB Eurodollar Operating Account was established "at Silicon Valley Bank's Cayman Islands branch office."  A true and correct copy of a template account agreement for a Eurodollar Operating Account ("**Operating Account Agreement**") is attached hereto as **Exhibit 10**

47.     The Operating Account Agreement contains provisions notifying SVB Cayman customers-depositors of the applicability of Cayman law, that their accounts are only payable and collectible at SVB Cayman and subject to the exclusive jurisdiction of the Cayman Courts, and their duty to comply with Cayman law:

> [T]he Eurodollar Operating Account(s) shall be and shall remain subject to the laws of the Cayman Islands and to the paragraph below. You agree not to conduct any transaction that would violate any laws of any state or the United States (including the economic sanctions administered by the U.S. Treasury's Office of Foreign Assets Control), of the Cayman Islands or of any other government.
>
> SVB Eurodollar Operating Account deposits are deposits of the Cayman Islands branch of Silicon Valley Bank ('Cayman Branch') and are subject to the laws of the Cayman Islands. These deposits are NOT domestic deposits, are NOT insured by the FDIC and are NOT guaranteed in any way by the United States government or any government agency thereof. The obligations related to the SVB Eurodollar Operating Account will be payable and collectible only at and by the Cayman Branch, subject to the laws (including any governmental actions, orders, decrees and/or regulations) and under the exclusive jurisdiction of the courts of the Cayman Islands.

Ex. 10 at pp. 2-3.

48.     At the time of the SVB Collapse, there were four hundred eighty-four (484) active Eurodollar Operating Accounts, with total account balances of $368,212,751.

**C.  SVB Cayman's Domestic Deposit Account with SVB**

49.     Upon information and belief, prior to the SVB Collapse, it was the regular practice for SVB Cayman to deposit all of its cash with SVB in a deposit account located in the United

13

States. SVB Cayman's sole asset was the depository liability owed by SVB in connection with this account (the "**SVB Cayman Domestic Account**").

50.     Upon information and belief, the SVB Cayman branch maintained a domestic account in the United States at SVB's main headquarters with account number xxxx0000 and the notation "non-interest bearing deposits" and "foreign offices," under circumstances where the sole beneficiary for this account was SVB Cayman (as there were no other foreign deposit taking branches) and that the credits located in this domestic account were SVB Cayman's sole asset and located in the United States.

51.     Upon information and belief, SVB's main headquarters maintained domestic, United States sitused accounts for each and all of the SVB Cayman Eurodollar Accounts with the following account numbers: (i) SVB Cayman Sweep (xxxx5000); (ii) Cayman Eurodollar MMA (xxxx6000); (iii) SVB Cash Sweep Clearing Purchases-Foreign Offices (xxxx1940); (iv) Interest Payable on SVB Cayman Sweep (xxxx0500); and (v) Interest Payable – Cayman Eurodollar MMA Deposits (xxxx0600).

52.     Upon information and belief, all credits associated with the SVB Cayman Domestic Account and the SVB Cayman Eurodollar Accounts were geographically located in the United States at all material times.

**D.  The Intra-Group Service Level Agreement**

53.     The relationship between SVB and SVB Cayman was governed by an Intra-Group Service Level Agreement, entered into by and between SVB Cayman, as recipient, and Silicon Valley Bank (U.S. Head Office), as provider (the "**SLA**"). A true and correct copy of the SLA is attached hereto as **Exhibit 11**

54.     The recitals to the SLA expressly note that SVB Cayman is regulated by CIMA, that SVB is separately regulated by the California Department of Business Oversight and the Federal Reserve, and that the SLA is being entered into on an "arm's length basis."  Ex. 11 at Recitals A-C.

55.     Under the SLA, SVB Cayman looked to SVB's California office for staffing needs in select service areas such as finance, IT services, legal and risk management (the "**Shared Services**"). For each Shared Service, SVB and SVB Cayman were each required to appoint separate representatives, known as "Agreement Managers," who served as the primary point of contact with the corresponding party.

56.     Each Agreement Manager had full authority to act for, and on behalf of, the respective party on all matters relating to the SLA. Further, each Agreement Manager was required to meet with his or her counterpart at regular intervals to discuss compliance with the terms of the SLA, any issues of concern to either party, and proposed solutions for addressing issues of concern.

57.     The SLA acknowledged that CIMA and other Cayman governmental agencies regulated SVB Cayman, and provided:

> In providing the Services, the Provider agrees to: A. Comply with all applicable Regulatory Requirements and Compliance Requirements necessary to perform its obligations under this Agreement; and B. Obtain and maintain all necessary licences, permits, consents and regulatory approvals from the relevant Regulators, if any, and to the extent applicable, necessary to perform its obligations under this Agreement.

Ex. 11 at Sec. 12.1.

58.     The SLA further provided that SVB Cayman was the primary reporting contact for any inquiries from CIMA:

> The Recipient will be responsible, unless otherwise agreed in writing by the Parties, for all communications and correspondence with its Regulator(s) (which, for the purposes of this Agreement, shall be the Cayman Island Monetary Authority) in

#242597214_v1

relation to the receipt of the Services and this Agreement. The Provider will direct enquiries from the Recipient's Regulator relating to this Agreement to the Recipient unless the enquiry is specifically addressed to, or concerns, the Provider or the Provider is prevented from doing so by applicable Law or Regulatory Requirements. Each Party shall provide the other Party and/ or any Regulator all reasonable assistance in connection with any enquiry or investigation by any Regulator concerning this Agreement or the relevant Party and shall notify the other Party of any enquiries or investigations unless prevented from doing so by applicable Law or Regulatory Requirements.

Ex. 11 at Sec. 13.1.

59.     While it relied on SVB's operational staff, risk management, and infrastructure in certain circumstances, SVB Cayman also operated independently of SVB in many respects. For example, SVB Cayman's day-to-day management was vested in a dedicated Cayman Branch team under the leadership of a Cayman Branch Executive Director.

60.     Under the SLA, SVB Cayman was permitted to terminate the SLA on 60 days' notice, and it reserved the right to independently audit SVB's books and records.  Ex. 11 at Sec. 19.1.

61.     Additionally, SVB Cayman's corporate governance was vested with the Cayman Branch Operating Committee, which provided leadership and strategic oversight for all of SVB Cayman's activities.  Ex. 11 at Schedule 5.

## II.     Collapse of SVB and Sale to First-Citizens Bank

62.     On March 8, 2023, SVB liquidated investments to cover deposits; this included selling off U.S. treasuries and mortgage-backed securities at a $1.8 billion loss.

63.     On March 9, 2023, SVB customers withdrew more than $40 billion and, at the close of business, SVB had a negative cash balance of $958 million, effectively resulting in the collapse of SVB (the "**SVB Collapse**").

64.    On March 10, 2023, the California Department of Financial Protection and Innovation ("**DFPI**") determined that (a) SVB's liquidity position was inadequate, and it could not reasonably be expected to pay its obligations as they came due; (b) SVB was insolvent; and (c) SVB was conducting its business in an unsafe manner due to its financial condition.  The DFPI Order Taking Possession of Property and Business is attached hereto as **Exhibit 12**.

65.    As a result, DFPI ordered that SVB's property and business be placed into a receivership with FDIC-R1. Janine D. Henkes was appointed as Receiver-in-Charge in connection with the receivership for SVB.

66.    On March 10, 2023, the day that SVB was closed, FDIC-C created the Deposit Insurance National Bank of Santa Clara ("**DINB**") and transferred all insured deposits of SVB to the DINB. The FDIC-C then announced that:

> All insured depositors will have full access to their insured deposits no later than Monday morning, March 13, 2023. The FDIC will pay uninsured depositors an advance dividend within the next week. Uninsured depositors will receive a receivership certificate for the remaining amount of their uninsured funds. As the FDIC sells the assets of Silicon Valley Bank, future dividend payments may be made to uninsured depositors.

A true and correct copy of FDIC-C's March 10, 2023 press release is attached hereto as **Exhibit 13**.

67.    Over the weekend of March 11, 2023, it was determined that the appointment of FDIC-R1 as receiver did not calm concerns that there would be further mass withdrawals from deposit accounts.  Further, the initial attempts by FDIC-R1 and FDIC-C to find a purchaser bank for SVB were unsuccessful.

68.    Accordingly, FDIC-C and FDIC-R1 took two steps.  <u>First</u>, FDIC-C rescinded the agreement transferring insured deposits to the DINB, and FDIC-R1 transferred all deposits at SVB — insured and uninsured, alike — to Bridge Bank.

69.     On March 13, 2023, via a Transfer Agreement (the "**Transfer Agreement**"), FDIC-R1 transferred all deposits, both insured and uninsured, and substantially all assets of SVB and SVB Cayman to Bridge Bank, which was newly created and operated by FDIC-R1 pursuant to applicable federal law.  A true and correct copy of the Transfer Agreement is attached hereto as **Exhibit 14**.

70.     Upon information and belief, depositors-creditors of SVB Cayman – the account holders of the SVB Cayman Eurodollar Accounts – had full access to funds in their accounts now being held by the Bridge Bank up and until March 31, 2023.

71.     This was consistent with the press statements made by the FDIC at the time.  On March 13, 2023, the FDIC published its own independent press release stating that its March 12, 2023 transfer of "all deposits — both insured and uninsured — and substantially all assets of" Silicon Valley Bank to Bridge Bank was "an action designed to protect all depositors of Silicon Valley Bank," and "[d]epositors will have full access to their money beginning this morning, when Silicon Valley Bridge Bank, N.A., the bridge bank, opens and resumes normal banking hours and activities."  A true and correct copy of the FDIC's March 13, 2023 press release is attached hereto as **Exhibit 15**.

72.     Moreover, upon the Bridge Bank's opening on March 13, 2023, the FDIC announced on its website that all funds on account with the Bridge Bank were safe and that all deposit holders would have full access to their funds:

> IS MY MONEY SAFE? **Yes!** No one lost any money on deposit as a result of the closure of this bank. All deposits, regardless of dollar amount, were transferred to Silicon Valley Bank, N.A. [*i.e.*, Bridge Bank].

A true and correct copy of a printout from the FDIC's website is attached hereto as **Exhibit 16**

73.     Upon information and belief, the transfer of all funds to the newly created, FDIC-R operated Bridge Bank included the transfer of all funds associated with the SVB Cayman Domestic Account and the SVB Cayman Eurodollar Accounts.

74.     Second, over the March 11, 2023 weekend, Treasury Secretary Yellen invoked the systemic risk exception.

75.     Generally, depositors at FDIC-insured depository institutions are insured up to a maximum amount of $250,000. *See* 12 U.S.C. §§ 1821(a)(1)(A), (a)(1)(E). Congress established the federal Deposit Insurance Fund ("**DIF**"), which is funded with deposit insurance premium payments collected from banking institutions, and guarantees repayments of insured deposits up to the statutory insured limit of $250,000 upon a bank's failure. *See* 12 U.S.C. § 1821(a)(4).

76.     Other than the $250,000 cap, the other limitations on FDIC insurance status include (i) that the depositor be a U.S. citizen and (ii) that the account is payable in the United States. *See* 12 U.S.C. §§ 1813(l)(5) and 1813(m).

77.     On March 12, 2023, a joint statement press release (the "**Joint Statement Press Release**") was issued by Secretary of the Treasury Janet L. Yellen, Federal Reserve Board Chair Jerome H. Powell, and FDIC Chairman Martin J. Gruenberg, announcing that all SVB assets were transferred to FDIC-R1, assuring all SVB depositors that they would have full access to their money on Monday morning, March 13, 2023, and that they would be made whole, beyond the standard insured amount of $250,000.  A true and correct copy of the Joint Statement Press Release is attached hereto as **Exhibit 17.**

78.     The FDIC's announcement was based upon Treasury Secretary Janet Yellen's invocation of the systemic risk exception (the "**SRE**"), which was based on the unanimous recommendation of the FDIC-C, the Federal Reserve, and in consultation with the President of the

United States.  Such invocation mandates the FDIC-C to insure and pay the full amount of all deposits for all depositors of SVB above the $250,000 cap, and further removes the requirement that the insured account holder be a U.S. person within the meaning of the Federal Deposit Insurance Act. These decisions, at best, left only the geographic credit situs limitation intact.

79.     On or about March 27, 2023, the FDIC-C and FDIC-R1 entered into a Purchase and Assumption Agreement (the "**P&A Agreement**") with First-Citizens Bank & Trust Company ("**First-Citizens**"), covering certain SVB deposits and loans transferred to and then held at the Bridge Bank.  A true and correct copy of the P&A Agreement is attached hereto as **Exhibit 18.**

80.     The P&A Agreement included a purchase of approximately $72 billion of the Bridge Bank's assets at a discount. Notably, the P&A Agreement gave First-Citizens the express option to purchase the Canadian, German, and Hong Kong foreign branches (all of which did not accept deposits and only provided lending services), but did not provide First-Citizens with the option to purchase SVB Cayman (the only foreign branch of SVB that accepted deposits).

81.      The Canada, India, Germany, and Israel branches of SVB were not licensed by their respective local authorities to accept deposits. The United Kingdom affiliate (with its own Denmark and Sweden branches) was separately incorporated as Silicon Valley Bank UK. The China affiliate of SVB operated as an independent joint-venture with Shanghai Pudong Development Bank.

82.     As a result, SVB Cayman was not purchased by or transferred to First-Citizens pursuant to the P&A Agreement.

83.     In connection with the P&A Agreement, the Bridge Bank was formally placed into receivership with FDIC-R2, and George R. Fritz was appointed as Receiver-in-Charge in connection with the receivership for the Bridge Bank.

84.     Upon information and belief, on March 31, 2023, without the consent of, or notice to, holders of the Eurodollar Money Market Accounts and Eurodollar Operating Accounts , FDIC-R transferred all SVB Cayman funds out of their accounts with the Bridge Bank, and left these accounts with a $0 balance.

**III.     The Post-SVB Collapse "Orphaning" of SVB Cayman**

85.     On March 31, 2023, concurrently with the draining of funds from their accounts, the depositors-creditors of SVB Cayman that held Eurodollar Operating Accounts and Eurodollar Money Market Accounts (collectively, the "**Operating/Money Market Account Holders**") received a notice from FDIC-R stating that, in FDIC-R's view, balances held by customers in accounts at SVB Cayman are not deposits, and therefore, their status as a result of SVB's failure is that of general unsecured creditors, which is junior in priority to both insured and uninsured depositors.

86.     Also on March 31, 2023, the Operating/Money Market Account Holders received notice from FDIC-R1 that they were entitled to file claims in the SVB Receivership being administered by FDIC-R1 as general unsecured creditors, with a claims bar date of July 10, 2023.

87.     Upon information and belief, FDIC-R1 received 605 timely submitted claims from the Operating/Money Market Account Holders prior to the bar date, all of which claims were made on a general unsecured creditor basis.

88.     Upon information and belief, FDIC-R1 allowed 501 of these claims in full, allowed 18 in part, and disallowed 76. Of the remaining ten claims, six were duplicate claims and four were withdrawn by the claimant.

89.     Account holders for Eurodollar Sweep Accounts did not receive any such notices, with their accounts being granted "insured deposit" status, even though the account agreements

for each of the three SVB Cayman Deposit Accounts contains identical language that the SVB Cayman Eurodollar Accounts are not FDIC-insured and are payable and collectible only in the Cayman Islands.

90.     FDIC-R has provided holders of the Eurodollar Sweep Accounts with "insured depositor" status, granting them a full guarantee by FDIC-C under the SRE and priority in the SVB Receivership waterfall.

91.     FDIC-R's stated justification for this decision is that a certain amount of the funds associated with the Eurodollar Sweep Accounts had "swept back" into an FDIC-insured deposit account located in the United States at or around the time of SVB's entry into receivership.

92.     FDIC-R's arbitrary decision does not on its face comport with the 12 U.S.C. § 1813(l)(5) definition of an insured deposit, which classifies the Eurodollar Sweep Account as a "foreign account" (*i.e.* uninsured).

93.     Upon information and belief, the decision to include the Eurodollar Sweep Accounts within the insurance of the SRE and classify them as "deposit" accounts was, at least in part, a discretionary decision by FDIC-R.  In connection with invocation of the SRE, the geographic limitation on insurance and depositor status was *NOT waived* along with the account limit and U.S. account holder limitations.

94.     Upon information and belief, FDIC-R exercised its discretion to *not* include the Operating/Money Market Account Holders within the insured pool as a matter of discretion on the basis that their credits were not geographically located in the United States (the "**Discretionary Insurance Decision**").

95.     FDIC-R's analysis is and was wrong. Credits for **<u>all</u>** of the SVB Cayman Eurodollar Accounts were located in SVB accounts located and maintained in the United States, as were the

#242597214_v1

credits for the SVB Cayman Domestic Account, a segregated account maintained at SVB's headquarters in California.

96.     Moreover, the credibility of these false justifications is diminished where more than 90% by holder (and 99% by value) of the Operating/Money Market Account Holders of SVB Cayman are of Chinese origin or China-investment connected, while the demographics of holders of the Eurodollar Sweep Accounts are mixed and nominal – resulting in a stark disparity of outcome as a result of the FDIC-R's decisions.

97.     The discretionary decisions to over-insure the Sweep Account depositors above $250,000 and waive the U.S. person limitation, but **not** waive the U.S. geographic situs limitation (by implication) was arbitrary and capricious or an impermissible exercise of discretion based upon national origin – especially under circumstances where the only possible party impacted by the U.S. Geographic situs limitation was SVB Cayman and its depositors-creditors – given SVB Cayman was the sole foreign deposit-taking branch of Silicon Valley Bank.

98.     The FDIC-R, stepping into the powers of Silicon Valley Bank's former management, "moved" the SVB Cayman depositors' funds into the SVB Receivership estate without the safeguards and approvals required of all licensed bank branches in the Cayman Islands.

99.     Given that no such authorization was ever provided to FDIC-R, the funds associated with the SVB Eurodollar Accounts and the SVB Cayman Domestic Account were (digitally) "located" in the Cayman Islands in which case the transfer of funds associated with these Cayman accounts to FDIC-R occurred without the assent of CIMA, the SVB Cayman Agreement Manager, or the Grand Court.

100.     This constituted an *ultra vires* and *void ab initio* act resulting in a constructive trust.

101.    Alternatively, the digital situs of the funds was in the United States at the time of the transfer, and such funds should have been covered by FDIC insurance or deemed "deposits" within the meaning of the relevant FDIC priority statutes for purposes of the SVB Receivership.

102.    The SVB Cayman Domestic Account constitutes a depository liability owed by SVB and Bridge Bank to SVB Cayman and is located in the United States, and further falls within the fully-insured accounts covered by Secretary Yellen's invocation of the SRE.

103.    The JOLs, who were appointed in June 2023, have received no notice from Defendants concerning the status of the SVB Cayman Domestic Account.

104.    The arbitrary decision of Defendants is not limited to the classification of the Eurodollar Sweep Accounts as insured deposits.  Upon information and belief, with the exception of insider deposit accounts held in the name of SVB's parent company, all uninsured accounts and other products offered by SVB were granted FDIC insurance in the full amount of the account pursuant to the SRE, or otherwise were liabilities fully assumed by First-Citizens in connection with the P&A Agreement.  *See* P&A Agreement at Section 2.1 (listing assumption of liabilities for, *inter alia*, letters of credit, general liabilities, qualified financial contracts, and loan servicing obligations).

## IV.    The JOLs' Provisional Proof of Claim

105.    The FDIC-imposed bar date to file claims in the SVB Receivership was Monday, July 10, 2023, shortly after the JOLs' appointment and prior to the selection of United States counsel.  Under the circumstances, the JOLs caused to be filed a provisional and placeholder proof of claim ("**Provisional Proof of Claim**").  A true and correct copy of the Provisional Proof of Claim is attached hereto as **Exhibit 19**.[1]

---

[1] While the Provisional Proof of Claim is addressed to FDIC-R2 as receiver for Bridge Bank, it expressly asserts claims against a number of other parties, including but not limited to FDIC-R1

106.    In correspondence and communications with counsel for the FDIC-R, it agreed to consider a supplement to the Provisional Proof of Claim at a later date, notwithstanding the bar date in effect.

107.    On January 3, 2024, a scanned copy of a letter (the "**Claim Denial Letter**") from FDIC-R2 was received by Alston & Bird (U.S. counsel previously considered for full engagement by the JOLs and the sole filer of the Provisional Proof of Claim), which letter appears to have been mailed on December 26, 2023.  The Claim Denial Letter purports to disallow SVB Cayman's claim on the unexplained ground that it was "not proven to the satisfaction of the Receiver."  A true and correct copy of the Claim Denial Letter is attached hereto as **Exhibit 20.**

## CLAIMS FOR RELIEF

### Count I: *De Novo* Review of Claim Disallowance Pursuant to 12 U.S.C. § 1821(d)(6) (against FDIC-R1 and FDIC-R2)

108.    Plaintiffs repeat and re-allege each of the foregoing paragraphs as if fully set forth herein.

109.    On July 10, 2023 SVB Cayman, on behalf of the SVB Cayman Branch and as exclusive agent for all creditors-depositors of SVB Cayman, timely filed the Provisional Proof of Claim, asserting claims against FDIC-R1 and FDIC-R2, as well as SVB and the Bridge Bank.

---

and SVB.  *See* Provisional Proof of Claim at Section II.  In connection with the Provisional Proof of Claim, the Claim Denial Letter (defined below) was only sent by FDIC-R2. Regardless, 12 U.S.C. § 1821(d)(6)(A) permits this Court to preside over *de novo* review of a claim asserted against a failed bank in FDIC receivership within 60 days of the earlier of (i) the mailing of the notice of disallowance of the claim by the FDIC receiver; or (ii) in the event the FDIC receiver fails to make a claim determination, the date 180 days after the filing of the claim.  Here, the Claim Denial Letter was mailed on December 26, 2023, and the date which is 180 days after the filing of the claim against FDIC-R1 is January 6, 2024.  As this Complaint is filed within 60 days of both dates, this Complaint is timely pursuant to 12 U.S.C. § 1821(d)(6)(A).

110.    By letter dated December 26, 2023, FDIC-R2 sent the Claim Denial Letter disallowing SVB Cayman's claim on the basis that it was "not proven to the satisfaction of the Receiver."

111.    Pursuant to the Winding Up Order, Plaintiffs have standing to bring these claims directly on behalf of the SVB Cayman branch and as exclusive agent of the depositors-creditors of SVB Cayman.

112.    As set forth herein, FDIC-R made the arbitrary decision to classify holders of Eurodollar Money Market Accounts and Eurodollar Operating Accounts as general unsecured creditors of the SVB Receivership, rather than holders of insured deposits with higher priority claims in both the SVB Receivership (such as with the Eurodollar Sweep Accounts).

113.    The account agreements for each of the three SVB Cayman Eurodollar Accounts contain identical language that the Cayman accounts are not FDIC-insured and are payable and collectible only in the Cayman Islands.

114.    Accordingly, the decision to classify the Eurodollar Sweep Accounts within as deposits was a discretionary decision by the FDIC. The geographic limitation on insurance and depositor status was NOT waived along with the account limit and U.S. account holder limitations.

115.    Further, the SVB Cayman Deposit Account was a segregated account with all cash and credits associated with such account located in the United States at all material times.

116.    The cash associated with all SVB Cayman accounts , including but not limited to the SVB Cayman Domestic Account and the SVB Cayman Eurodollar Accounts, were always located in the United States.

117.    More than 90% of the SVB Cayman account holders classified as "unsecured creditors" are of Chinese origin or China-investment connected (99% by value), while the

demographics of the SVB Cayman account holders classified as "insured depositors" are mixed and nominal – resulting in a stark disparity of outcome as a result of FDIC-R's decisions.

118.    The discretionary decisions to over-insure the Sweep Account depositors above $250,000 and waive the U.S. person limitation, but not waive the U.S. geographic situs limitation was arbitrary and capricious or an impermissible exercise of discretion based upon national origin.

119.    WHEREFORE, Plaintiffs seek entry of a declaratory judgment pursuant to 12 U.S.C. § 1821(d)(6) classifying the Eurodollar Money Market Accounts, the Eurodollar Operating Accounts, and the SVB Cayman Domestic Account as "deposits" for purposes of the Federal Deposit Insurance Act.

### Count II: *De Novo* Review of Claim Disallowance Pursuant to 12 U.S.C. § 1821(d)(6) (against FDIC-R1 and FDIC-R2)

120.    Plaintiffs repeat and re-allege each of the foregoing paragraphs as if fully set forth herein.

121.    Pursuant to the Winding Up Order, Plaintiffs have standing to bring these claims as exclusive agent of the depositors-creditors of SVB Cayman.

122.    Upon information and belief, FDIC-R1 notified certain creditors-depositors of SVB Cayman of disallowance of their claims in the SVB Receivership.

123.    The JOLs are currently without access to SVB Cayman's books and records concerning the SVB Cayman Eurodollar Accounts and FDIC-R has objected to the turnover of copies of SVB Cayman's books and records.

124.    In the event that during discovery, it is discovered that either FDIC-R1 or FDIC-R2 wrongfully disallowed a claim of any individual SVB Cayman creditor-depositor, the Plaintiffs hereby seek *de novo* review of FDIC-R's claim determination.

#242597214_v1

125.     WHEREFORE, on a provisional basis, Plaintiffs seek entry of an order allowing the claim of all SVB Cayman depositor-creditors which submitted claims against FDIC-R1 and FDIC-R2.

**Count III: *Void Ab Initio* and *Ultra Vires Act***
**(against FDIC-R1 and FDIC R-2)**

126.     Plaintiffs repeat and re-allege each of the foregoing paragraphs as if fully set forth herein.

127.     Pursuant to the Winding Up Order, Plaintiffs have standing to bring these claims directly on behalf of the SVB Cayman branch and as exclusive agent of the depositors-creditors of SVB Cayman.

128.     When SVB failed in March 2023, SVB Cayman's customers had, in the aggregate, at least $866,174,948 deposited in the SVB Cayman Eurodollar Accounts.

129.     Upon information and belief,  SVB Cayman had a segregated account with SVB for its sole benefit referred to herein as the SVB Cayman Domestic Account.

130.     All of the SVB Cayman Eurodollar Accounts and the SVB Cayman Domestic Account were subject to Cayman Islands law and the control of CIMA and the Cayman Islands Courts.

131.     On March 13, 2023, via the Transfer Agreement, FDIC-R1 transferred all deposits, both insured and uninsured, and substantially all assets of SVB and SVB Cayman to the Bridge Bank.

132.     FDIC-R1, stepping into the powers of SVB's former management, "moved" the SVB Cayman funds associated with the SVB Cayman Eurodollar Accounts and the SVB Cayman Domestic Account into the SVB receivership estate without the safeguards and approvals required of all licensed bank branches in the Cayman Islands.

133. Further, on March 31, 2023, FDIC-R2 drained the accounts of the Money Market/Operating Account Holders of all funds, leaving these accounts with a $0 balance.

134. No authorization was ever provided to FDIC-R to effectuate these transfers. The transfer of funds occurred without the assent of CIMA or the Grand Court, as required by applicable law.

135. WHEREFORE, Plaintiffs seek entry of a declaratory judgment finding all transfers by FDIC-R of all funds and credits associated with the SVB Cayman Eurodollar Accounts and the SVB Cayman Domestic Account to be *void ab initio* and *ultra vires* act, and imposition of a contrastive trust in connection with the same.

### Count IV: Conversion
### (against FDIC-R1 and FDIC-R2)

136. Plaintiffs repeat and re-allege each of the foregoing paragraphs as if fully set forth herein.

137. Pursuant to the Winding Up Order, Plaintiffs have standing to bring these claims directly on behalf of the SVB Cayman branch and as exclusive agent of the depositors-creditors of SVB Cayman.

138. As set forth herein, SVB Cayman had the right and entitlement to possess the funds in the SVB Cayman Domestic Account.

139. As set forth herein, the holders of SVB Cayman Eurodollar Accounts had the right and entitlement to possess the funds in the SVB Cayman Eurodollar Accounts.

140. FDIC-R knowingly and wrongfully took possession and dissipated all funds associated with the SVB Cayman Domestic Account and the SVB Cayman Eurodollar Accounts.

141. WHEREFORE, on behalf of SVB Cayman and as the exclusive agent of the SVB Cayman depositors-creditors, Plaintiffs seeks compensatory damages in an amount to be proven

at trial against FDIC-R due to their wrongful conversion, plus fees and expenses in connection with seeking reimbursement.

## Count V – Unjust Enrichment
## (against FDIC-R1 and FDIC-R2)

142.    Plaintiffs repeat and re-allege each of the foregoing paragraphs as if fully set forth herein.

143.    Pursuant to the Winding Up Order, Plaintiffs have standing to bring these claims directly on behalf of the SVB Cayman branch and as exclusive agent of the depositors-creditors of SVB Cayman.

144.    As set forth herein, FDIC-R wrongfully effectuated the transfer of all funds associated with the SVB Cayman Domestic Account and the SVB Cayman Eurodollar Accounts to the Bridge Bank and, thereafter, First-Citizens.

145.    By FDIC-R wrongfully seizing funds belonging to SVB Cayman and SVB Cayman's creditors-depositors without notice or authorization, a benefit was conferred upon FDIC-R and SVB Cayman and SVB Cayman's creditors-depositors suffered a detriment.

146.    It is unjust and inequitable for FDIC-R to retain any benefit without compensating Plaintiffs for such benefit.

147.    As a direct and proximate result of its actions, FDIC-R has been unjustly enriched, at the expense of SVB Cayman and its creditors-depositors, in an amount to be determined at trial.

148.    WHEREFORE, on behalf of SVB Cayman and as the exclusive agent of the SVB Cayman depositors-creditors, Plaintiffs seeks compensatory damages in an amount to be proven at trial against FDIC-R in the amount of their unjust enrichment, plus fees and expenses in connection with seeking reimbursement.

## Count VI – Breach of Account Agreements

**(against FDIC R-1 and FDIC R-2)**

149.    Plaintiffs repeat and re-allege each of the foregoing paragraphs as if fully set forth herein.

150.    Pursuant to the Winding Up Order, Plaintiffs have standing to bring these claims directly on behalf of the SVB Cayman branch and as exclusive agent of the depositors-creditors of SVB Cayman.

151.    Holders of the SVB Cayman Eurodollar Accounts maintained account agreements with SVB whereby SVB agreed to hold all funds associated with these accounts and that such funds would be "payable and collectible" in the Cayman Islands.

152.    FDIC-R, as receiver, stands in the shoes of SVB and is bound by all terms of contracts entered into by and among SVB and third parties.

153.    Upon information and belief, holders of the SVB Cayman Eurodollar Accounts fulfilled all obligations under the account agreements.

154.    FDIC-R breached these agreements, by misappropriating the funds associated with the SVB Cayman Eurodollar Accounts, in direct breach of the account agreements.

155.    Holders of the SVB Cayman Eurodollar Accounts have been damaged as a proximate result of FDIC-R's breach of the account agreements.

156.    WHEREFORE, Plaintiffs seek compensatory damages against FDIC-R due to their breach of the account agreements, plus fees and expenses in connection with seeking reimbursement.

**Count VII – Breach of SLA**
**(against FDIC R-1 and FDIC R-2)**

157.    Plaintiffs repeat and re-allege each of the foregoing paragraphs as if fully set forth herein.

31

158.    Pursuant to the Winding Up Order, Plaintiffs have standing to bring these claims directly on behalf of the SVB Cayman branch and as exclusive agent of the depositors-creditors of SVB Cayman.

159.    The relationship between SVB and SVB Cayman was governed by the SLA, entered into by and between SVB Cayman, as recipient, and Silicon Valley Bank (U.S. Head Office), as provider.

160.    FDIC-R, as receiver, stands in the shoes of SVB and is bound by all terms of the SLA.

161.    Upon information and belief, holders SVB Cayman Eurodollar fulfilled all obligations under the SLA.

162.    By misappropriating the funds associated with the SVB Cayman Eurodollar Accounts and the SVB Cayman Domestic Account, FDIC-R breached the SLA, which required SVB and its successors-in-interest to comply with Cayman law and Cayman regulations pertaining to the maintenance and operation of SVB Cayman.

163.    SVB Cayman has been damaged as a proximate result of FDIC-R's breach of the SLA.

164.    WHEREFORE, Plaintiffs seek compensatory damages against FDIC-R due to their breach of the SLA, plus fees and expenses in connection with seeking reimbursement.

**Count VIII – Violation of Due Process under the 5th Amendment of the U.S. Constitution (against Henkes, Fritz and John Does 1-100)**

165.    Plaintiffs repeat and re-allege each of the foregoing paragraphs as if fully set forth herein.

32

#242597214_v1

166.    Pursuant to the Winding Up Order, Plaintiffs have standing to bring these claims directly on behalf of the SVB Cayman branch and as exclusive agent of the depositors-creditors of SVB Cayman.

167.    The Fifth Amendment's Due Process Clause protects against the government's deprivation of property without adequate due process.  Both SVB Cayman and the creditors-depositors of SVB Cayman are afforded this Constitutional right.

168.    Henkes, Fritz, and John Does 1-100 are federal officers employed by the Federal Deposit Insurance Corporation that, at all relevant times, acted under color of federal authority.

169.    In reaching the arbitrary decision, which, upon information and belief, was based on national origin concerns, to classify the Money Market/Operating Account Holders as general unsecured creditors rather than insured depositors, and transferring all funds associated with the SVB Cayman Domestic Account and the SVB Cayman Eurodollar Accounts without authority, Henkes, Fritz and John Does 1-100 deprived SVB Cayman and the Money Market/Operating Account Holders of property without due process.

170.    No statutory cause of action provides Plaintiffs with a meaningful remedy in connection with the constitutional violations of Henkes, Fritz and John Does 1-100.

171.    This Court can fashion an appropriate monetary remedy in connection with the constitutional violations of Henkes, Fritz and John Does 1-100.

172.    WHEREFORE, Plaintiffs seek compensatory damages against Henkes, Fritz and John Does 1-100 in connection with their violation of the 5th Amendment of the United States Constitution, plus all fees, costs, interest and punitive damages.

**Count IX – Transfer for Undervalue and Voidable Preference Under Cayman Law**
**(against FDIC R-1 and FDIC R-2)**

173.    Plaintiffs repeat and re-allege each of the foregoing paragraphs as if fully set forth herein.

174.    Pursuant to the Winding Up Order, Plaintiffs have standing to bring these claims directly on behalf of the SVB Cayman branch and as exclusive agent of the depositors-creditors of SVB Cayman.

175.    Section 146(2) of the Cayman Islands Companies Act (2023 Revision) states, in relevant part: "Every disposition of property made at an undervalue by or on behalf of a company with intent to defraud its creditors shall be voidable at the instance of its official liquidator."

176.    In addition, Section 145(1) of the Cayman Islands Companies Act (2023 Revision) states, in relevant part: "Every conveyance or transfer of property, or charge thereon, and every payment obligation and judicial proceeding, made, incurred, taken or suffered by any company in favour of any creditor at a time when the company is unable to pay its debts within the meaning of section 93 with a view to giving such creditor a preference over the other creditors shall be invalid if made, incurred, taken or suffered within six months immediately preceding the commencement of a liquidation."

177.    FDIC-R's transfers of funds and credits associated with the SVB Cayman Domestic Account and SVB Cayman Eurodollar Accounts were made with intent to defraud creditors of SVB Cayman, as it transferred and dissipated substantially all assets of the SVB Cayman branch and its depositors-creditors, with the inevitable consequence that SVB Cayman's obligations to its creditors would be defeated.

178.    FDIC-R's transfers of funds and credits associated with the SVB Cayman Domestic Account and SVB Cayman Eurodollar Accounts were made with a fraudulent purpose, as they

were effectuated in clear violation of applicable Cayman law and Cayman regulations, for the purposes of orphaning the SVB Cayman branch and its creditors-depositors.

179. At the time of FDIC-R's transfers of funds and credits associated with the SVB Cayman Domestic Account and SVB Cayman Eurodollar Accounts, SVB Cayman was insolvent and unable to pay its debts.

180. FDIC-R's transfers of funds and credits associated with the SVB Cayman Domestic Account and SVB Cayman Eurodollar Accounts amounted to a transfer of, *inter alia*, property of SVB Cayman, made (i) with the intent to give insiders a preference over the other creditors of SVB Cayman; (ii) at a time when SVB Cayman was unable to pay its debts; and (iii) within the six months immediately preceding the commencement of SVB Cayman's liquidation.

181. Accordingly, Plaintiffs are entitled to a judicial determination that FDIC-R's transfers of funds and credits associated with the SVB Cayman Domestic Account and SVB Cayman Eurodollar Accounts and any subsequent transfers are invalid and/or voidable under the law of the Cayman Islands, and for any other relief this Court deems just and proper.

## PRAYER FOR RELIEF

NOW, THEREFORE, Plaintiffs pray for judgment and relief against Defendants as follows:

A. On Count I, a declaratory judgment pursuant to 12 U.S.C. § 1821(d)(6) classifying the Eurodollar Money Market Accounts, the Eurodollar Operating Accounts, and the SVB Cayman Domestic Account as "deposits" for purposes of the Federal Deposit Insurance Act and allowing such claims in the receivership estates administered by FDIC-R1 and FDIC R-2;

B. On Count II, entry of judgment allowing the claim of all SVB Cayman depositors-creditors which submitted claims against FDIC-R1 and FDIC-R2;

  C.  On Count III, a declaratory judgment finding all transfers by FDIC-R of all funds and credits associated with the SVB Cayman Eurodollar Accounts and the SVB Cayman Domestic Account to constitute *void ab initio* and *ultra vires* acts, and imposition of a constructive trust;

  D.  On Counts IV through VII, money damages in an amount to be determined, plus pre-judgment and post-judgment interest, fees and costs against FDIC-R1 and FDIC-R2;

  E.  On Count VIII, compensatory and punitive damages in an amount to be determined, plus pre-judgment and post-judgment interest, fees and costs against Fritz, Henkes and John Does 1-100;

  F.  On Count IX, money damages including pre-judgment and post-judgment interest, avoidance, disgorgement, set aside, recovery of and/or constructive trust;

  G.  Fees and costs in favor of Plaintiffs and against Defendants; and

  H.  Such other and further relief as the Court may deem just and proper.

Dated: February 23, 2024

          /s/ Steven D. Gordon
          HOLLAND & KNIGHT LLP
          Steven D. Gordon, Esq.
          (D.C. Bar No. 219287)
          800 17th Street N.W., Suite 1100
          Washington, District of Columbia 20006
          Telephone: 202.955.3000
          steven.gordon@hklaw.com

          *Attorneys for Plaintiffs*

OF COUNSEL:

Warren E. Gluck, Esq.
Richard A. Bixter, Jr., Esq.
Marie E. Larsen, Esq.
31 W. 52nd Street 12th Floor
New York, NY 10019
Telephone: 212.513.3200
warren.gluck@hklaw.com
richard.bixter@hklaw.com

marie.larsen@hklaw.com